UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID CURRIE,

        Petitioner,

                                       CASE NO. 13-CV-10252
v.                                   HONORABLE AVERN COHN

LLOYD RAPELJE,

        Respondent.
_____/

**MEMORANDUM ORDER**
**DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS**
**AND**
**DENYING A CERTIFICATE OF APPEALABILITY**

**I. Introduction**

    This is a habeas case under 28 U.S.C. § 2254.  In 2007, Michigan prisoner David Currie ("Petitioner") was convicted by a jury of assault with intent to murder, carjacking, three counts of armed robbery, felon in possession of a firearm, and possession of a firearm during the commission of a felony.  He was sentenced as a third habitual offender to concurrent terms of 35 to 70 years imprisonment on the assault, carjacking, and armed robbery convictions, a concurrent term of 5 to 10 years imprisonment on the felon in possession conviction, and a consecutive term of two years imprisonment on the felony firearm conviction.

    Before the Court is Petitioner's petition, filed through counsel, for a writ of habeas corpus.  Petitioner raises claims concerning the sufficiency of the evidence, the effectiveness of trial and appellate counsel, and the validity of his sentence.

Respondent contends that three of the claims are barred by procedural default and that all of the claims lack merit. For the reasons that follow, the petition will be denied for lack of merit.

## II. Facts

Because Petitioner raises a sufficiency of the evidence claim, a detailed account of the facts revealed at trial is necessary.

Petitioner's convictions arise from a crime spree targeting motorists during the early morning hours on April 28, 2006 in Detroit, Michigan. Four men, Petitioner, Elgie Grays, Jason Treadwell, and Brion McConnell, were charged in the crime spree, which involved the men posing as police officers and pulling over motorists in order to rob them. Several motorists were assaulted and robbed and an off-duty Detroit police officer was killed. Petitioner was tried in a joint trial before separate juries with co-defendant Grays.[1]

The surviving victims of the crime spree testified at trial. John Feazell testified that he was driving home from his grandmother's house and was near the intersection of Rutland and Dover in Detroit around 3:00 a.m. on April 28, 2006, when a silver Honda CRV pulled in front of him and cut him off causing him to stop his vehicle. Three

---

[1]Grays was convicted of second-degree murder (vacated), first-degree murder, carjacking, three counts of armed robbery, assault with intent to commit murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony. Treadwell was convicted in a separate trial of first-degree murder, assault with intent to rob while armed, carjacking, two counts of armed robbery, assault with intent to commit murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony. McConnell pleaded guilty to second-degree murder, two counts of armed robbery, and possession of a firearm during the commission of a felony.

black men exited the vehicle and a fourth man remained in the back passenger seat pointing a gun out of the window. Feazell identified the older man who exited the vehicle as Brion McConnell and identified the shorter man who exited the driver's side of the vehicle as Jason Treadwell. The third man who exited the passenger side of the vehicle had braids.

The men said they were police officers, pointed guns at him, and ordered him to exit his vehicle and put his hands up against the vehicle. They took his gold chain and cell phone. The three man discussed whether to shoot him. Treadwell wanted to shoot him, but the man with the braids disagreed and told Feazell to run, which he did.

Feazell ran west on Dover and when he got to Longacre, a green car with an out-of-state license plate was heading north on Longacre and drove past him. When Feazell got to Archdale, he saw the same green car parked in a driveway, along with the silver Honda CRV, and saw the men pointing guns at the green car and yelling that they were the police. Feazell called the police and took them to the location where he was robbed. His vehicle was subsequently found on a nearby street.

Later that day, Feazell gave the police a statement in which he described the men involved in the incident. His descriptions of McConnell and Treadwell were more complete than those of the other men. Feazell attended line-ups before trial, but could not recall any identifications. At trial, he identified Petitioner and Grays as the two men involved in the incident with McConnell and Treadwell. Grays was the person with the braids who told him to run. He could not recall what type of gun Grays had, but he said that Petitioner had a chrome or nickel-plated .38 because he saw it sticking out of the

3

Honda CRV window.  On cross-examination, Feazell testified that he did not see the fourth man in the back of the SUV so he could not say whether Petitioner was that man.

Marie Leinonen testified that she was driving in her red Mercury Sable in the area of Ashton and VanBuren in Detroit around 3:00 a.m. on April 28, 2006 looking to purchase marijuana.  An SUV cut her off and four black men exited the SUV with guns. One man fired a shot and told her to open the door.  The men said they were police. She did not think they were the police, so she put her car in reverse.  Shot were fired at her car, so she stopped and opened her door.  She was hit in the head and her purse was taken.  Although Leinonen was bleeding and her car windows were shot out, she was able to drive away and go to a gas station eight blocks away for help.  She gave a statement to police that day and indicated that only two men exited the SUV.  Leinonen testified that the four men involved in the incident were black, but she was unable to identify any of them in a lineup or at trial.

Dewayne Smith testified that he was driving in a green Honda Accord with an out-of-state license plate in the area of Archdale and Joy in Detroit around 3:00 a.m. on April 28, 2006 when someone tried to flag him down, but he did not stop.  He drove into a driveway on Archdale.  A minivan pulled up and armed black men exited the vehicle, said that they were the police, and ordered him to put his hands up.  The men ordered him to turn around and one of them struck him on the head.  They took his wallet and money.  He was then told to run to the corner, which he did.  Smith testified that one man was older and a different height than the other men, but he could not recall hairstyles.  He was unable to identify the perpetrators.  On cross-examination, Smith

4

clarified that three men exited the minivan, but he said there were three to five involved in the incident because someone stayed in the back of the minivan.

Myra Andrews testified that she was driving with her brother in a Buick Century near Faust and Belton in Detroit around 3:30 a.m. on April 28, 2006 when a grey Honda truck rolled past her and cut her off while she was stopped at a stop sign. She saw four black men in the Honda. A man with a muscular build and braids wearing a black hoodie and a skull cap exited the passenger seat with a weapon. Andrews testified that he looked like Grays, but she was not sure. She did not know if Petitioner was present. Andrews backed into a driveway and drove over the sidewalk and down the street. On cross-examination, Andrews explained that Grays looked similar to the perpetrator but she could not say that it was him. She also admitted that she picked someone else out of a lineup before trial.

People associated with the co-defendants also testified at trial. Felicia Walker, who had a familial connection to Treadwell, testified that Treadwell and other men came to her house on April 28, 2006. They stayed about 30 minutes, left, and returned about an hour later. She did not see them, but heard the voices of Treadwell, Grays, and Petitioner. They left and returned a second time and went into the basement. She went to sleep and when she awoke, only Treadwell was at her house. Walker was interviewed by police in May, 2006 and appeared pursuant to an investigative subpoena. She told the authorities that an older man was with the other three men at her house. She saw weapons that night, but did not see Petitioner with one. She recalled hearing a demand for jewelry and seeing McConnell pointing a gun at someone on the corner near her house. She also recalled hearing an argument in the basement

5

and hearing Treadwell say that Grays had shot someone and hearing Grays say that he was not the only one shooting. Walker said that she did not want to be involved in the case, but she was threatened if she did not cooperate. She claimed that she only told the police what they wanted to hear due to those threats.

Jessie Guiden, McConnell's aunt, testified that she had given McConnell permission to drive her 2006 silver Honda CRV on the night of the crime spree. She was interviewed by the police in May, 2006, and the interview was unpleasant. She did not sign her police statement.

Police personnel who investigated the crime spree testified at trial. Detroit police evidence technician Lori Briggs testified that she responded to the crime scene at Joy and Longacre at about 4:30 a.m. On Joy, she found six R & P nine millimeter casings, a spent bullet, suspected blood, and a Sprint pocket PC. She observed a beige minivan with bullet holes and broken windows crashed against a light pole at Joy and Southfield. In the locked console inside the van, she recovered a Detroit police-issued Glock firearm.

Detroit police officer Kirk Williams testified that he was in a marked squad car with his partner during the early morning hours on April 28, 2016 when they responded to the crime scene at Joy and Southfield and observed the crashed van with the windows shot out. Detroit police officers Grant and Heath were down the street standing near the body of Officer Charles Phipps, who had been shot several times and was unresponsive. Williams found Phipps' service weapon and his wallet the van's console. He observed a set of keys in the passenger seat and a set in the van's ignition.

Detroit police sergeant Kevin Reed, a firearms and toolmark identification expert, testified that he examined casings and bullets from two different scenes, one in the area of Joy and Longacre and the other on Faust. He found that the R & P nine millimeter casings were all fired from the same weapon, as was the bullet recovered from the medical examiner's office. The two other nine millimeter bullets had been fired from a different weapon. None of the bullets or casings had been fired from Phipps' service weapon.

Detroit police officer Mary Gross analyzed several items, including casings, for fingerprints. She found usable fingerprints on a piece of paper. Detroit police officer Donald Rem, an evidence technician, testified that he found fingerprints on the exterior of the Honda CRV. Detroit police officer Marcia McCleary, a latent print examiner, testified that she was able to identify one of the fingerprints as belonging to McConnell. Fingerprints recovered from the Honda CRV did not match Petitioner.

Detroit crime lab forensic chemist William Steiner testified that eight samples taken from inside and outside the Honda CRV tested positive for gunshot residue. He also collected possible DNA samples on items taken from the Honda CRV and samples from four people, including Petitioner. Cathy Carr, a DNA expert, testified that DNA from items in the Honda CRV matched McConnell's DNA profile and that Petitioner was excluded.

Brion McConnell appeared at trial pursuant to an agreement with the prosecutor in which he agreed to testify truthfully about the crime spree in exchange for a plea to a reduced charge with a sentence of 18 to 28 years in prison. He testified that he was with Petitioner, Grays, and Treadwell on August 28, 2006. He recalled driving to Grays'

house and drinking in the back seat of the Honda CRV. He said that Petitioner was armed that night, but he did not remember what happened due to an alcohol blackout. During his police interview, however, McConnell provided the police with sketches of where the four men had been in the vehicle. McConnell also told the police that Treadwell cut off a car, that Treadwell and Petitioner exited the vehicle, and that Treadwell was shooting, but he did not know if Petitioner was shooting. McConnell said Treadwell and Petitioner were the two men who were out of the car when Phipps was killed. McConnell testified that he got his information on the sketch from the police and that he told the police what they wanted to hear. He said that he did not recall who shot at the vehicles and that he cooperated with the police to protect his son. He said that he entered a plea agreement because everyone said that he was involved in the crime spree.

Dr. Boguslaw Pietak, a forensic pathologist, testified that he performed the autopsy on Charles Phipps. Dr. Pietak stated that Phipps died from nine gunshot wounds, but he was unable to determine if more than one person or firearm was involved in the shooting.

Petitioner's police statement was also admitted into evidence at trial. Detroit police officer Lance Sullivan testified that he interviewed Petitioner on May 6, 2006. During their first meeting, he advised Petitioner of his rights, but Petitioner refused to make a statement. Sullivan then took Petitioner for a lineup before questioning him again. During their second meeting, Sullivan falsely told Petitioner that all but one person picked him out of the lineup. Petitioner initially refused to make a statement, but after about an hour, he changed his mind. Sullivan re-advised Petitioner of his rights

and Petitioner agreed to answer questions.  Sullivan wrote out the questions and

answers and Petitioner signed the statement.  The statement follows:

Q      Mr. Currie, please tell me about the incidents that occurred on the morning of April 28, 2006, in which a man was shot and killed on Joy and Longacre.

A      Jason [Treadwell], Brion [McConnell], and Elgie [Grays] came by and picked me up on Dequindre around nine p.m. to ten p.m. on 4-27-06. Brion was driving. We decided to go to the west side to Jason's sister's house. Her house is on Rutland and we stopped there for about 15 minutes. After we left the sister's house we were going down Rutland towards Joy and we passed a car . . . that was going the other way. Jason said turn around and get that car. Brion was still driving. He turned around and caught the car, then blocked it off. When we stopped Brion jumped out of the driver's seat and Jason jumped out of the back (driver's side). I was in the front seat and stayed in the truck along with Elgie who was sitting behind me on the passenger side. Big Brion held a guy at gunpoint while Jason robbed him. I  don't know what he got. He was tussling with him. Jason said something like 'I should shoot your mother fucking ass. Where's the money at', to the guy. I said, come on, don't shoot him. The guy took off running and Brion jumped in the guy's car and drove off. Jason jumped back in the driver's seat and was following Brion. Brion went a couple of blocks and stopped. He got back  in the truck we were in, driver's side back. Jason drove for a little while to the other side of Southfield Freeway. Jason was driving down the street and met a car head-on causing her to stop. When the lady stopped a guy jumped out and ran. Then big Brion and Jason jumped out to rob her and she took off going past the truck. We didn't get anything from her. The guy who took off kept running. Jason started driving again and within a block or two he stopped another vehicle. I think it was red. There was a lady in it, I think black. I was approaching her car with my gun out. I told her to give me her purse. She just sat there for a few seconds. Jason ran past me and swung at her and was saying something to her. I don't remember if she fled or stayed in the car. Jason and Elgie started shooting at the car. Jason first. We all ran back to the truck. Jason jumped in the driver's seat, Brion had stayed in the back in the driver's side. Elgie got in the front passenger and I was getting in the rear passenger side when Jason put the truck in forward and punched it. It knocked me down to the ground and the back wheel ran over my right leg. Elgie said you're running him over. Jason put it in reverse and ran my foot over. The door was still opened, I tried to hold onto it, the truck dragging me scrapping by left arm, elbow and hands.

Elgie and Jason helped me in the truck rear passenger side. I told them to take me to the hospital but Jason said he was going to take me to the house first. He was on Joy Road going towards Rutland. We saw a van coming the other way and Jason said, 'I'm going to get this mother fucker here'. He swung the truck around and caught up to and cut off a mini van. Jason and Elgie jumped out. Elgie went to the passenger side and Jason went to the driver's door. Jason opened the door and was exchanging words with the guy. They started tussling and Jason was pulling the guy out of the van. Jason fired at the guy at least a couple times. When the guy came out of the van, it looked like he was going to the ground and Jason was just shooting at his head and neck area. The van rolled off while Jason was pulling him out. I heard some other shots but didn't see who was shooting. Elgie and Jason jumped back in the truck and we went over on Rutland. I couldn't get out on by own so Jason and Elgie helped me in the house.

Once in the house we all went to the basement. I think I was sitting on the bed and spitting up some blood. The other guys were talking. I don't recall their words. I called a female "April" to come and get me. She came and got me in about 30 minutes and took me to the house. I was the first to leave."

Q      Who is Jason?

A      Jason is a guy from the neighborhood. I've known him, like, ten years.

Q      Who is Elgie?

A      Another guy from the neighborhood. I've known him 15 years.

Q      Who is Brion?

A      He's an older guy from the neighborhood that's been around awhile.

Q      Do you recall what the other guys were wearing?

A      No, not really. Brion had on a dob (hat).

Q      What type of vehicle were you in?

A      A gray Honda, four door SUV.

Q      Can you describe the weapons that everyone had?

A    Brion had a 44 Magnum revolver chrome. Jason had a chrome nine millimeter automatic. Elgie had a nine millimeter black automatic. I had a 357 revolver black. Elgie's was, like, a Tech 9.

Q    Do you know where the guns went to?

A    I gave them to Elgie. He was supposed to put them up. I don't know where the other ones went.

Q    Why did this happen?

A    We all needed the money.

Q    What is Jason's sister's name?

A.    Felicia

Q    Have you spoke to anyone since that night? (Jason, Brion, Elgie).

A    I spoke to Elgie the next day but not about what happened.

Q    Do you know where any of the items stolen that night went to?

A.    No.

Q    Is there anything else you would like to say?

A    No.

Q    Is this statement true?

A    Yes.

3/26/07, Trial Tr., pp. 10-16.

At the close of trial, the jury found Petitioner guilty of carjacking Feazell, three counts of armed robbery for the robberies of Feazell, Leinonen, and Smith, assault with intent to murder Leinonen, felon in possession of a firearm, and possession of a firearm during the commission of a felony. The trial court subsequently sentenced him as set forth above.

### III. Procedural History

Petitioner filed an appeal of right with the Michigan Court of Appeals raising a claim that trial counsel was ineffective for failing to call him to testify at a <u>Walker</u> hearing regarding the admissibility of his police statement. The court of appeals denied relief on that claim and affirmed his convictions. <u>People v. Currie</u>, No. 278072 (Mich. Ct. App. July 15, 2008) (unpublished). The Michigan Supreme Court denied leave in a standard order. <u>People v. Currie</u>, 483 Mich. 887 (2009).

Petitioner then filed a motion for relief from judgment and a supplemental motion for relief from judgment with the trial court raising claims concerning prosecutorial misconduct, due process, the sufficiency of the evidence, the effectiveness of trial and appellate counsel, and the validity of his sentence. The trial court denied relief on those claims finding that Petitioner failed to establish cause and/or prejudice for his failure to raise the claims on direct appeal under M.C.R. 6.508(D)(3) because the claims lacked merit. <u>People v. Currie</u>, No. 06-008305-01 (Wayne Co. Cir. Ct. July 21, 2010, Jan. 21, 2011).[2] Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." <u>People v. Currie</u>, No. 305882 (Mich. Ct. App. Dec. 27, 2011). The Michigan Supreme Court similarly denied relief. <u>People v. Currie</u>, 493 Mich. 868 (2012) and denied reconsideration. <u>People v. Currie</u>, 493 Mich. 931 (2013).

Petitioner then filed the instant petition. He raises the following claims:

_____

[2]As to the claim that counsel was ineffective in failing to obtain suppression of Petitioner's police statement, the trial court also ruled that the claim was barred by M.C.R. 6.508(d)(2), which precludes relief on a claim that was previously denied on direct appeal.

I. His convictions for the carjacking and armed robbery of John Feazell and the armed robbery of Dewayne Smith violate due process and as such constituted an extreme malfunction of the Michigan criminal justice system as there was insufficient evidence as to each element of the charged offenses.

II. He was denied the effective assistance of counsel when counsel's total performance is considered.

III. His sentences were imposed contrary to the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

IV. He is entitled to habeas relief because he was denied his right to the effective assistance of counsel on his direct appeal.

The Court, on Petitioner's motion, stayed and administratively closed the case to allow him to return to the state courts to exhaust his sentencing claim based upon Alleyne v. United States, 570 U.S. 99 (2013). (Doc. 13). Petitioner ultimately abandoned his appeal of this claim in state court and moved to reopen this case and proceed on his existing exhausted claims. The Court then reopened this case for further consideration. (Doc. 19).

## IV. Standard of Review

28 U.S.C. § 2241 et seq., sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions. The statute provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in
         the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)); see also Bell v. Cone, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413); see also Bell, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" Wiggins, 539 U.S. at 520-21 (citations omitted); see also Williams, 529 U.S. at 409.  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Lindh, 521 U.S. at 333, n. 7; Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). A habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Thus, in order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id.; see also White v. Woodall, _ U.S. _, 134 S. Ct. 1697, 1702 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." Woods v. Donald, _ U.S. _, 135 S. Ct. 1372, 1376 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. Woods v. Etherton, _ U.S. _, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. Williams, 529

15

U.S. at 412;  see also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (noting that

the Supreme Court "has held on numerous occasions that it is not 'an unreasonable

application of clearly established Federal law' for a state court to decline to apply a

specific legal rule that has not been squarely established by this Court") (quoting

Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam)); Lockyer, 538 U.S. at

71-72.  Section 2254(d) "does not require a state court to give reasons before its

decision can be deemed to have been 'adjudicated on the merits.'"  Harrington, 562

U.S. at 100.  Furthermore, it "does not require citation of [Supreme Court]

cases–indeed, it does not even require awareness of [Supreme Court] cases, so long

as neither the reasoning nor the result of the state-court decision contradicts them."

Early v. Packer, 537 U.S. 3, 8 (2002); see also Mitchell, 540 U.S. at 16.

The requirements of "clearly established law" are to be determined solely by

Supreme Court precedent.  Thus, "circuit precedent does not constitute 'clearly

established Federal law, as determined by the Supreme Court,'" and "[i]t therefore

cannot form the basis for habeas relief under AEDPA."  Parker v. Matthews, 567 U.S.

37, 48-49 (2012) (per curiam); see also Lopez v. Smith, _ U.S. _ 135 S. Ct. 1, 2 (2014)

(per curiam).  The decisions of lower federal courts may be useful in assessing the

reasonableness of the state court's decision.  Stewart v. Erwin, 503 F.3d 488, 493 (6th

Cir. 2007) (citing Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir. 2003)); Dickens v.

Jones, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal

habeas review.  28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption with

clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

Habeas review is also "limited to the record that was before the state court." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

## V.  Discussion

### A.  Procedural Default

As an initial matter, Respondent contends that Petitioner's insufficient evidence, ineffective assistance of trial counsel, and sentencing claims that Petitioner raised in his motion for relief from judgment (excluding the ineffective assistance of appellate counsel claim) are barred by procedural default because he first raised those claims on collateral review and the state courts denied relief under M.C.R. 6.508(D)(3).

Federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 85-87 (1977); <u>Couch v. Jabe</u>, 951 F.2d 94, 96 (6th Cir. 1991).  The doctrine of procedural default applies when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent."  <u>White v. Mitchell</u>, 431 F.3d 517, 524 (6th Cir. 2006); <u>Howard v. Bouchard</u>, 405 F.3d 459, 477 (6th Cir. 2005); Coleman v. Mitchell, 244 F.3d 533, 539 (6th Cir. 2001).

Petitioner first presented his insufficient evidence, ineffective assistance of trial counsel, and sentencing claims to the state courts in his motion for relief from judgment.  The Michigan Supreme Court and the Michigan Court of Appeals both denied relief pursuant to M.C.R. 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause

for the failure to raise such grounds previously and actual prejudice resulting therefrom. Mich. Ct. R. 6.508(D)(3).  The Court of Appeals for the Sixth Circuit has held that the form orders used by the Michigan appellate courts to deny leave to appeal in this case is unexplained because the citation to Michigan Court Rule 6.508(D) is ambiguous as to whether it refers to a procedural default or a rejection on the merits.  Guilmette v. Howes, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc).  Consequently, under Guilmette, the Court must "look through" any unexplained orders of the Michigan appellate courts to the trial court's decision to determine the basis for the denial of state post-conviction relief.

Here, the trial court denied relief on procedural grounds by ruling that Petitioner had not shown cause and actual prejudice under M.C.R. 6.508(D)(3) for his failure to raise the claims on direct appeal of his convictions.  See Currie, No. 06-008305-01, op. at *9-10, suppl. order at *3.  The state courts clearly relied upon a procedural default to deny Petitioner relief on these claims.  Accordingly, the claims are procedurally defaulted.

However, because as will be explained, Petitioner's defaulted claims lack merit, the Court need not determine whether Petitioner has overcome his procedural default by showing cause or prejudice or a miscarriage of justice.  See Trest v. Cain, 522 U.S. 87, 89 (1997) (holding that procedural default is not a jurisdictional bar to review of a habeas petition the merits); Hudson v. Jones, 351 F. 3d 212, 215 (6th Cir.2003)(stating that "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."(citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)).

18

## B.  Merits

### 1.  Insufficient Evidence

Petitioner first asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his convictions for the carjacking of Feazell and the armed robberies of Feazell and Smith.  The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d).  Martin v. Mitchell, 280 F.3d 594, 617 (6th Cir. 2002).  Thus, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable.  Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009).  "[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial."  Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).  "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court."  Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003) (citing Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).  Accordingly, the "mere existence of sufficient

evidence to convict . . . defeats a petitioner's claim." <u>Matthews</u>, 319 F.3d at 788-89. Additionally, the <u>Jackson</u> standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Brown v. Palmer</u>, 441 F.3d 347, 351 (6th Cir. 2006) (quoting <u>Jackson</u>, 443 U.S. at 324 n. 16).

Under Michigan law, the elements of carjacking are: (1) the defendant took a motor vehicle from another person, (2) the defendant did so in the presence of that person, a passenger, or any other person in lawful possession of the motor vehicle, and (3) the defendant did so either by force or violence, by threat of force or violence, or by putting the other person in fear. <u>People v. Green</u>, 228 Mich. App. 684, 694 (1998); Mich. Comp. Laws § 750.529a(1). The elements of armed robbery are: (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. <u>People v. Ford</u>, 262 Mich. App. 443, 458(2004); <u>People v. Johnson</u>, 206 Mich. App. 122, 123 (1994); Mich. Comp. Laws § 750.529.

Identity is an element of every offense. <u>People v. Yost</u>, 278 Mich. App. 341, 356 (2008). The prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense. <u>People v. Kern</u>, 6 Mich. App. 406, 409 (1967). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, <u>People v. Jolly</u>, 442 Mich. 458, 466 (1993), including the identity of the perpetrator, <u>Kern</u>, 6 Mich. App. at 409, <u>see also</u> <u>People v. Johnson</u>, 146 Mich. App. 429, 434 (1985), and the defendant's intent or state of mind. <u>People v. Dumas</u>, 454 Mich. 390, 398 (1997); <u>see also</u> <u>People v. Nowack</u>, 462 Mich. 392, 402-03 (2000).

Citing the Jackson standard, the trial court denied relief on this claim, explaining:

> This Court disagrees with defendant's assessment there was nothing more than mere speculation to connect him to the robberies of Feazell and Smith, there was sufficient evidence that Currie was an assailant in this crime spree. Brion McConnell, a member of group participating in this crime spree, stated that the men were looking for money that morning. The evidence elucidated at trial placed Currie with McConnell, Treadwell, and Grays in a Honda CRV in the neighborhood where and when the crime spree occurred. In addition, Feazell testified that Currie pointed a gun at him from the passenger side of the CRV during the robbery and carjacking. Thus, this Court concludes that there was sufficient evidence to convict Currie for his participation in this crime spree for both carjacking and armed robbery.

Currie, No. 06-008305-01, suppl. order at *2.

This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[3] The testimony at trial, an reasonable inferences therefrom, provided sufficient evidence of Petitioner's guilt of the offenses. John Feazell testified that three men exited the vehicle to rob him and a fourth man stayed in the car and pointed a gun out of the window. Feazell initially testified that Petitioner was one of the men involved in the incident, although he later said that he could not say if Petitioner was the fourth man in the back of the vehicle. Dewayne Smith could not identify the perpetrators, but he described the vehicle and the men involved in the incident, indicating that three men exited the vehicle while one stayed inside the vehicle. The testimony from all of the surviving victims of the crime spree showed that the incidents occurred within a certain area and within a short period of time. Although Brion McConnell testified that blacked out and did not remember what happened that night, he recalled driving to Grays' house in the silver Honda CRV.

[3]The Court would reach the same result under a de novo standard of review.

He also provided the police with a statement.  In that statement, he told the police that he was with Petitioner, Treadwell, and Grays on the night of the crime spree, that they were armed, and that Petitioner and Treadwell wanted to get money.  He provided a sketch of where the men sat in their vehicle.  Felicia Walker testified that Petitioner was at her house with Grays, McConnell, and Treadwell on the night of the crime spree. Additionally, Petitioner provided a statement to police in which he admitted participating in the crime spree with the other men (although he did not discuss an active role in the carjacking of Feazell or the armed robberies of Feazell and Smith).  Petitioner also admitted that the four men were armed and that they wanted money that night.

Such evidence, and reasonable inferences therefrom, was sufficient to establish beyond a reasonable doubt that Petitioner participated in the carjacking of Feazell and the armed robberies of Feazell and Smith, and that he was not merely present during those incidents.  Petitioner challenges the inferences the jury drew from the testimony at trial and the jury's credibility determinations.  However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve such evidentiary conflicts.  Cavazos, 565 U.S. at 7; Jackson, 443 U.S. at 326; Walker v. Engle, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  The jury's verdict, and the trial court's decision on collateral review, were reasonable.  Habeas relief is not warranted on this claim.

## 2. Ineffective Assistance of Trial Counsel

Petitioner next asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to alleged prosecutorial misconduct, for failing to object to alleged witness intimidation, for failing to object to alleged hearsay, and for failing to properly argue for suppression of Petitioner's police statement.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of trial counsel. To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. Id. at 690. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id. at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. The reviewing court's scrutiny of counsel's performance is highly deferential. Id. at 689. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. Id. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

The Supreme Court has confirmed that a federal court's consideration of an ineffective assistance of counsel claim arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington, 562 U.S. at 105 (internal and end citations omitted). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. Rather, the question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard. Id.

Petitioner first asserts that counsel was ineffective for failing to object to alleged instances of prosecutorial misconduct, namely the prosecutor's argument that there was nothing wrong with the police lying to Petitioner about line-up identifications during his interrogation, that Petitioner admitted making his police statement, and that a victim had been dragged from his vehicle. The trial court denied relief on this claim finding that the prosecutor's comment on the police conduct did not deprive Petitioner of a fair trial even if it was improper because his police statement was admissible and that the prosecutor's other comments were based upon reasonable inferences from the evidence and any error would be harmless, such that counsel was not ineffective. Currie, No. 06-008305-01, opin. at pp. 5-7.[4]

---

[4]The trial court discussed the prosecutor's conduct in the context of appellate counsel's effectiveness, but the same analysis holds true for trial counsel's

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[5]  Counsel may have reasonably decided not to object to the prosecutor's statements because they were within the bounds of acceptable conduct.  The Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction."  Berger v. United States, 295 U.S. 78, 88 (1935).  To prevail on a claim of prosecutorial misconduct, however, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citing Donnelly); see also Parker v. Matthews, 567 U.S. 37, 45 (2012) (confirming that Donnelly/Darden is the proper standard).

In this case, the prosecutor's arguments were not improper.  The police officer's act of lying to Petitioner about the evidence in his case (the witness identifications) does not rise to the level of coercive conduct that would, without more, invalidate his Miranda waiver or his confession.  See Illinois v. Perkins, 496 U.S. 292, 297 (1990) (Miranda does not prohibit "mere strategic deception"); Frazier v. Cupp,  394 U.S. 731, 739 (1969) (police misrepresentation of facts, while relevant, was insufficient to render an otherwise involuntary confession inadmissible); Ledbetter v. Edwards, 35 F.3d 1062, 1066-70 (6th Cir. 1994) (officer's false statements that police had fingerprint and

_____

effectiveness.

    [5]The Court would reach the same result under a de novo standard of review.

25

identification evidence implicating the suspect did not make his confession involuntary); Terry v. Bock, 208 F. Supp. 2d 780, 790 (E.D. Mich. 2002) (determination that petitioner had voluntarily waived his Miranda rights before making second statement was not unreasonable even if officer falsely told him that co-defendant had made a statement against him); see also Loza v. Mitchell, 766 F.3d 466, 480 (6th Cir. 2014) (citing cases and ruling that state court's decision that petitioner's confession was voluntary even though police falsely told him that they spoke to the victim, who was unresponsive, was reasonable).

The prosecutor's comment about the deceased victim being dragged from his vehicle was based upon a reasonable inference from the evidence, including where the body was found in relation to the location and condition of his vehicle. The same can be said with respect to the prosecutor's comment about Petitioner's police statements. While prosecutors may not misstate the evidence, United States v. Carter, 236 F.3d 777, 784 (6th Cir. 2001), or argue facts not in evidence, Abela v. Martin, 380 F.3d 915, 929 (6th Cir. 2004), they can make arguments based upon the evidence and have "'leeway to argue reasonable inferences from the evidence' during closing arguments." United States v. Crosgrove, 637 F.3d 646, 664 (6th Cir. 2011) (quoting Byrd v. Collins, 209 F.3d 486, 535 (6th Cir. 2000)). Such was the case here. Petitioner fails to show that the prosecutor engaged in misconduct that rendered his trial fundamentally unfair. He thus fails to show that trial counsel erred and/or that he was prejudiced by counsel's conduct in this regard.

Petitioner next asserts that trial counsel was ineffective for failing to object to alleged witness intimidation of Brion McConnell and Felicia Walker by the authorities

and to move to suppress their police statements. The state trial court denied relief on this claim finding that Petitioner failed to establish that the statements were inadmissible. Currie, No. 06-008305-01, opin. at pp. 8-9.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[6] Under federal and Michigan law, a criminal defendant does not have standing to challenge the voluntariness of a witness statement to the police because the privilege against self-incrimination of the Fifth and Fourteenth Amendments is personal in nature and does not extend to third parties called as witnesses at trial. United States v. Nobles, 422 U.S. 225, 234 (1975); Berry v. Mintzes, 529 F. Supp. 1067, 1075 (E.D. Mich. 1981); People v. Jones, 115 Mich. App. 543, 548, 321 N.W.2d 723 (1982), aff'd 419 Mich. 577, 358 N.W.2d 837 (1984). While the Sixth Circuit once indicated that the use of a witness's coerced testimony may violate a defendant's due process rights, see Bradford v. Johnson, 476 F.2d 66 (6th Cir. 1973) (state's knowing use of coercion testimony obtained by torture, threats and abuse of witness violated due process), the Supreme Court has not so ruled. See Samuel v. Frank, 526 F.3d 566, 569 (7th Cir. 2008) (sexual assault victim's police statement was admissible even though the police told her she would not get her baby back if she did not cooperate); see also Johnson v. Bell, 525 F.3d 466, 479-81 (6th Cir. 2008) (distinguishing Webb v. Texas, 409 U.S. 95 (1972), and Washington v. Texas, 388 U.S. 14 (1967), and denying relief on a claim that authorities coerced a witness into providing favorable prosecution testimony).

---

[6]The Court would reach the same result under a de novo standard of review.

Moreover, when faced with possible witness coercion, courts have not relied upon the exclusionary rule, but have instead considered the defendant's ability to cross-examine the witness about the alleged improper conduct as a matter of due process.  See Williams v. Woodford, 384 F.3d 567, 596 (9th Cir. 2004) ("There is no due process violation when a witness who previously was illegally interrogated is 'subject to cross-examination at trial through which the jury could assess the witness's credibility."); Wilcox v. Ford, 813 F.2d 1140, 1149 (11th Cir.1987) (defendant's due process rights are not violated when police act improperly in questioning a witness if the conduct is "not so extreme that it violates a sense of fundamental fairness, shocking to universal justice" and the defendant is able to cross-examine the witness about the police conduct); Taylor v. Renico, 2008 WL 2745129, *11-12 (E.D. Mich. 2008) (finding Wilcox persuasive).

Given the foregoing case law, counsel may have reasonably determined that the witnesses' statements were admissible and that the best strategy was to challenge their testimony on cross-examination and have them describe the allegedly improper police conduct in order to case doubt on the police investigation and to create sympathy for the defense.  Counsel cannot be ineffective for failing to make a futile or meritless objection, see Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2014) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."); United States v. Steverson, 230 F.3d 221, 225 (6th Cir. 2000), and the Court will not second-guess counsel's sound trial strategy.  Petitioner fails to establish that trial counsel erred and/or that he was prejudiced by counsel's conduct.

Petitioner also asserts that counsel was ineffective for failing to object to alleged hearsay on confrontational grounds when the prosecutor introduced transcripts of testimony from the investigative subpoena hearing in which Felicia Walker testified that she heard Treadwell say that Grays shot someone and that she heard Grays say that he was not the only one shooting, which included transcripts of the previous prosecutor's statements to Walker about her testimony. The state trial court denied relief on this claim finding that Petitioner failed to show that the ruling on the admission of the evidence was erroneous. <u>Currie</u>, No. 06-008305-01, opin. at pp. 7-8.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[7] First, Felicia Walker's testimony recounting her own prior investigate subpoena testimony is not hearsay. Under both federal and Michigan law, a prior inconsistent statement that is made under oath is not considered hearsay and can be used as substantive evidence. <u>See</u> <u>United States v. Ricketts</u>, 317 F.3d 540, 544 (6th Cir. 2003) (citing FED. R. EVID. 801(d)(1)(A)); <u>People v. Chavies</u>, 234 Mich. App. 274, 281-84 (1999) (citing MICH. R. EVID. 801(d)(1)(A)). Second, the use of such prior testimony did not violate the Confrontation Clause because Walker testified at trial and was subject to cross-examination. <u>See</u> <u>California v. Green</u>, 399 U.S. 149, 164 (1970).

Third, the admission of Walker's statements recounting what she heard Treadwell and Grays say did not violate the Confrontation Clause. The Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him.

---

[7]The Court would reach the same result under a de novo standard of review.

Davis v. Alaska, 415 U.S. 308, 315 (1973).  In Crawford v. Washington, 541 U.S. 36, 54 (2004), the Supreme Court held that the testimonial statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness.  Testimonial statements include grand jury testimony, preliminary hearing testimony, and prior trial testimony, as well as statements made during police interrogations.  Id. at 54. Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. Id. at 51-52, 56.  The Confrontation Clause is thus not implicated, and need not be considered, when non-testimonial hearsay is at issue.  Davis v. Washington, 547 U.S. 813, 823-26 (2006); see also Whorton v. Bockting, 549 U.S. 406, 420 (2007) (noting that the Confrontation Clause "has no application to such statements and therefore permits their admission even if they lack indicia of reliability").  Moreover, "because it is premised on the Confrontation Clause, the Bruton rule (concerning the admissibility of a non-testifying co-defendant's statements) . . . does not apply to non-testimonial statements."  United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009).  Treadwell's and Gray's comments, as recounted by Walker, were made to their cohorts and acquaintances, not the authorities.  Petitioner thus fails to show that the admission of the disputed evidence violated his confrontation rights or was otherwise improper. Consequently, he fails to show that counsel erred and/or that he was prejudiced by counsel's conduct.  As discussed supra, counsel cannot be deemed ineffective for failing to raise a futile or meritless objection.

Furthermore, even if the testimony was improper, Petitioner fails to show that he was prejudiced by its admission. Walker's statements did not implicate Petitioner in any shooting. Walker testified that Treadwell said that Grays shot someone and that Grays said that he was not the only one shooting. She/they did not say that Petitioner shot anyone and the record shows that four men participated in the crime spree. Petitioner fails to establish that counsel was ineffective under the Strickland standard.

Lastly, Petitioner asserts that counsel was ineffective for failing to properly argue for suppression of Petitioner's police statement. Petitioner complains that counsel failed to argue that his police statement should have been suppressed because the police lied to him about witness identifications in order to get him to waive his Miranda rights, not merely to elicit his confession. The state trial court denied relief on this claim finding that it lacked merit, and that counsel properly sought to suppress the statement, but the court deemed it to be admissible. Currie, No. 06-008305-01, opin. at pp. 8-9. The court further indicated that the issue of trial counsel's effectiveness concerning the suppression of Petitioner's police statement was previously addressed on direct appeal (in the context of counsel's decision not to have Petitioner testify at the Walker suppression hearing) and could not be re-litigated on collateral review. Id., suppl. order at pp. *1-2.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[8] The record reveals that trial counsel moved to suppress Petitioner's police statement on several grounds, that

[8]The Court would reach the same result under a de novo standard of review.

counsel elicited testimony showing that the police had Petitioner in custody for an extended period of time, that Petitioner refused to make a statement for several hours, that the police lied to him about witness identifications, and that the police discussed the case and encouraged him to tell his version of events before he waived his Miranda rights and made a statement, and that counsel made a plausible argument for suppression. Counsel's conduct was reasonable, albeit not perfect, under the circumstances.

Petitioner asserts that counsel should have argued that the police officer's lie about the witness identifications called for suppression of his police statement because the voluntariness standard for waiving Miranda rights is different (i.e. more strict) than for making a confession. In support of his argument, Petitioner cites language in Miranda v. Arizona, 479 U.S. 436 (1966), and Moran v. Burbine, 475 U.S. 412 (1986). It is well-settled that a defendant's waiver of Miranda rights must be both voluntary and knowing. Moran, 475 U.S. at 421. The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id; see also Miranda, 384 U.S. at 476.

However, "[t]he test for whether a Miranda waiver is voluntary, is essentially the same as the test for whether a confession is voluntary." United States v. Binford, 818 F.3d 261, 271 (6th Cir. 2016); see also Colorado v. Connelly, 479 U.S. 157, 169-70 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which Miranda was based, is

governmental coercion."). In both contexts, a court considers the totality of the circumstances, but coercive police activity is a "necessary predicate" to the finding that the waiver or the confession is involuntary within the meaning of Due Process Clause. Connelly, 479 U.S. at 167-68. A court must determine if: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to make a statement. Binford, 818 F.3d at 271 (citing United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999)); see also McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988).

"Not every deception by the police amounts to coercion or even impropriety." Hall v. Beckstrom, 563 F. App'x 338, 351 (6th Cir. 2014) (quoting Harris v. Hatfield, 21 F.3d 427, 1994 WL 95926, *3 (6th Cir. 1994)) (unpublished). As discussed supra, Miranda does not prohibit "mere strategic deception," Perkins, 496 U.S. at 297, and the police officer's act of lying to Petitioner about the evidence in his case (the witness identifications) does not rise to the level of coercive conduct that would, without more, invalidate his Miranda waiver or his confession. See Frazier, 394 U.S. at 739; Ledbetter, 35 F.3d at 1066-70; Terry, 208 F. Supp. 2d at 790; see also Loza, 766 F.3d at 480. "A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." Ledbetter, 35 F.3d at 1070. Given such legal precedent, Petitioner fails to show that counsel erred by failing to assert additional case law in support of the suppression motion and/or that the result of the proceeding would have been different had counsel done so. Petitioner thus fails

to establish that counsel was ineffective under the <u>Strickland</u> standard with respect to the suppression issue.  Habeas relief is not warranted on this claim.

### 3.  Sentencing Claim

Petitioner also asserts that he is entitled to habeas relief because the trial court sentenced him in violation of his Fifth, Sixth, and Fourteenth Amendment rights. Petitioner relies upon the United States Supreme Court's decisions in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and <u>Alleyne v. United States</u>, 570 U.S. 99 (2013).

A sentence imposed within the statutory limits is generally not subject to federal habeas review.  <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948); <u>Cook v. Stegall</u>, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999).  Claims which arise out of a trial court's sentencing decision are not cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law.  <u>Lucey v. Lavigne</u>, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001).  Petitioner's sentences are within the statutory maximums for his offenses and his third habitual offender status.  <u>See</u> MICH. COMP. LAWS §§ 750.83, 750.529a(1), 750.529, § 750.224f, 750.227b, 769.11.  Consequently, these sentences are insulated from habeas review absent a federal constitutional violation.

Here, the trial court denied relief on this claim on collateral review in 2011 (before <u>Apprendi</u> was decided) finding that Petitioner's sentence was within the sentencing guidelines and that his argument had no merit.  <u>Currie</u>, No. 06-008305-01, suppl. order at *2.  According to Petitioner's counsel, the trial court also denied relief on the merits of Petitioner's sentencing claim on collateral review (while this case was

stayed) but the parties have not supplemented the record before this Court with that decision.

In any event, the state court's denial of relief is neither contrary to Supreme Court precedent that existed at that time nor an unreasonable application of then existing federal law or the facts.[9]  In Apprendi, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi, 530 U .S. at 490.  In Alleyne, the Supreme Court extended Apprendi to mandatory minimum sentences, ruling that any fact that increases a mandatory minimum sentence is an "element" of the offense that must be submitted to the jury and proven beyond a reasonable doubt.  Alleyne, 570 U.S. at 111-12.

In People v. Lockridge, 498 Mich. 358 (2015), the Michigan Supreme Court held that, under Alleyne, the Michigan sentencing guidelines violate the Sixth Amendment because the guidelines "require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables that mandatorily increase the floor of the guidelines minimum sentence range."  Lockridge, 870 N.W.2d at 506.  The court's remedy was to make the guidelines advisory only.  Id. at 520-21.  Recently, the Sixth Circuit issued a decision agreeing with Lockridge and ruling that Alleyne clearly established that Michigan's pre-Lockridge mandatory minimum sentencing guidelines scheme violated the Sixth Amendment.  Robinson v. Woods, No. 16-2067, 901 F.3d

---

[9]The Court would reach the same result under a de novo standard of review.

710, *716-17 (6th Cir. 2018). The Sixth Circuit explained that "[a]t bottom, Michigan's sentencing regime violated Alleyne's prohibition on the use of judge-found facts to increase mandatory minimum sentences." Id. at *716. This Court is bound by the Sixth Circuit's decision.

Apprendi and Alleyne, however, are not applicable in this case. First, Petitioner neither alleges nor establishes that his sentences exceed the statutory maximums. Consequently, Apprendi has no bearing on his sentence. Second, Petitioner was sentenced in 2007 and his direct appeals concluded in 2009, well before Alleyne was decided in 2013. Alleyne was thus not clearly established law before Petitioner's convictions and sentences became final. Id. at *714-15 (citing Supreme Court cases which hold that Supreme Court decisions apply to pending criminal cases including those which are on direct appeal or not yet final); see also Greene v. Fisher, 565 U.S. 34, 37 (2011). Alleyne is not retroactively applicable to cases on collateral review. See In re Mazzio, 756 F.3d 487, 491 (6th Cir. 2014). And Lockridge is a state court decision, which does not constitute clearly established federal law as required to obtain federal habeas relief. See, e.g., Woods v. Donald, 135 S. Ct. at 1376. Petitioner is therefore not entitled to relief on any claim based upon Apprendi or Alleyne.[10]

To the extent that Petitioner generally alleges that his sentences violate due process, he is also not entitled to relief. Petitioner provides no facts or relevant legal argument demonstrating why his sentences violate his due process rights. Conclusory

---

[10]Moreover, Petitioner failed to exhaust his Alleyne claim in state court when he abandoned his appeal during his second collateral review proceedings (while this case was stayed). Thus, the claim is also unexhausted and procedurally defaulted.

allegations are insufficient to warrant federal habeas relief.  See Cross v. Stovall, 238

F. App'x 32, 39-40 (6th Cir. 2007); Workman v. Bell, 178 F.3d 759, 771 (6th Cir. 1998)

(conclusory allegations of ineffective assistance of counsel do not justify habeas relief;

see also Washington v. Renico, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and

conclusory allegations do not provide sufficient basis for an evidentiary hearing in

habeas proceedings).  Habeas relief is not warranted on this claim.

### 4.  Ineffective Assistance of Appellate Counsel

Lastly, Petitioner raises an independent claim that he is entitled to habeas relief

because appellate counsel was ineffective for failing to raise the collateral review

issues on direct appeal.  Respondent contends that this claim lacks merit.  The trial

court denied relief on this claim finding that the underlying collateral review claims

lacked merit such that appellate counsel was not deficient.  Currie, No. 06-008305-01,

op. at *7-9, suppl. order at *2-3.

The state court's decision is neither contrary to Supreme Court precedent nor an

unreasonable application of federal law or the facts.  The ineffective assistance of

appellate counsel claims, while not themselves procedurally defaulted, nonetheless

lack merit.  As discussed supra, Petitioner fails to establish that appellate counsel erred

by failing to raise the defaulted claims on direct appeal and the defaulted claims lack

merit.  Appellate counsel cannot be deemed ineffective for failing to raise issues that

lack merit.  Shaneberger v. Jones, 615 F.3d 448, 452 (6th Cir. 2010) (citing Greer v.

Mitchell, 264 F.3d 663, 676 (6th Cir. 2001)).  Habeas relief is not warranted on this

claim.

### VI.  Conclusion

For the reasons stated above, Petitioner is not entitled to habeas relief on his claims. Accordingly, the petition is DENIED. Further, jurists of reason would not find the Court's ruling debatable. Accordingly, the Court DENIES a certificate of appealability under 28 U.S.C. § 2253(c)(1)(a).[11]  See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).

This case is DISMISSED.

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  3/21/2019
        Detroit, Michigan

---

[11]"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.